Counsel, I'd like to say the same thing to you I did to the last counsel. This is not a terribly complicated case. It's not really deserving of twice as much time as the first cases we heard. So I think if you would try to present your arguments, it should easily be done in 10 rather than 20 minutes. Just sort of bear that in mind. We won't be rigid and hold you to anything. We don't generally do that. But the allocation is a little out of whack. I'll try to do it in 10 minutes, Your Honor, and I'm going to reserve three of that if I can. Thank you. That's my plan. I'm John McRory. I represent the appellant plaintiff, National Management Services, or NMS. This case arises out of a two-pronged attack against NMS by Qwest in 2000. First, what Qwest did is they unilaterally breached an agreement with NMS by reducing its commissions from 21% to 15%, resulting in a one-third reduction in revenue. Second, they changed their pricing structure so that they could sell to NMS's customers for less than NMS was buying from Qwest for. And at the same time, they violated their own policy, a well-accepted industry policy, of calling on NMS's national customers. We have three claims, and each of these claims I'm going to talk about were dismissed on summary judgment by the court. I'm going to try to give you the short, central reasons why the court was wrong and should be reversed on this. The first one, Your Honor, is the breach of contract claim, which the conduct of Qwest was reducing commissions from 21% to 15%. The agreement at issue here, as found by the district court magistrate, was the January 12, 1999 letter. In that letter, Qwest promised two things. Number one, they promised that for sales made by NMS in 1999, they would be paid according to a commission structure chart that was set forth in that letter, so that the sales that were made in 1999 would be rewarded by a commission at that rate. Second, what that letter said, what that letter promised, and it's on the second page of the January 12, 1999 letter, they promised that for the sales that were made in 1999, the level of sales in 1999 versus the sales that had been made in the prior year, 1998, would result in payment for 2,000 sales in the amount set forth in that letter. That was the second promise, and that was on January 12. Then in subsequent letters in March and July, Qwest confirmed that. What Qwest said in March when it sent another letter was, Your sales so far this year have been X compared to 1998. That's a percentage increase. You will be entitled next year to a percentage of 21%. What happened is that NMS went and they made sales in 1999. They were paid for those sales in 1999, and they had an expectation that those sales would get them so much in 2000, because that's what the contract said. May I ask you, could this contract have been terminated at any time by Qwest? It was not terminable by its terms. Till when? There was no termination provision. You mean it was a permanent contract? It could never be terminated? I think it could have been terminated, Your Honor, but again, I think Qwest would have had to use good faith. It wasn't terminable at will? It probably was terminable at will, Your Honor, because there was no termination provision in it, but Qwest would have had to exercise good faith in doing so. Well, suppose they did say we'd rather have a different sales group than yours. We're going to switch to an international selling corporation. We'll have them do this from now on. We're going to terminate this relationship. Couldn't they have done that? Well, I don't think they could have done it without compensating NMS for the work they had done. They would have had to comply with their promises. And it wouldn't have been a question of putting somebody else in there in NMS's place because there were other national advertisers, too, that NMS competed with. Was this an exclusive contract for a particular territory? It wasn't an exclusive as far as NMS having an exclusive territory, but NMS's business was a huge percentage of what's carrying out this contract. That's what NMS is. No, no, but I mean, in the territory where NMS operated, were there other people competing with you? Yes, there were. There were other national. All right. I just wanted to understand the context of it. So you're saying they couldn't change the rate, although they might have been able to terminate the services entirely. They would have had to give a reasonable notice, and they would have had to compensate NMS for the work they had done. Oh, yes, of course. They would have had to compensate them for what they'd done. And they would have had to comply with their promises. And one of their promises was that if you do work this year, you will be entitled to, based on that work, to a commission on your sales for next year. Well, what I'm trying to say is when they changed the rate, which I think was in July. No, it was in November, Your Honor. In November. Let's say they said in July or August or November, by the way, we really don't think we want you to do this job next year, in the year 2000. We'll pay you for everything you do in 1999. I hope you don't. We don't want to use your services in the year 2000. Could they have done that? I think they could have done it, but I think they would have had to compensate us something for making the efforts we made in 1999. Okay. But that also includes not only the 99 sales, but as we set forth in our brief, from about July of 1999 through November of 1999, those sales that were undertaken by NMS were for the 2000 directory. So we did actually perform and should have gotten the 2000 rate then for those sales. The rates don't apply to when you perform the services. They apply to where the listing will appear. Whether it's a listing for 2000 or for 1999 is determined not when you perform the services. Right, Your Honor. The services they performed during the last part of 1999 were selling advertisements that would appear in a book to be published in 2000. And those are to be paid for at the 2000 rate? At the 2000 rate. That's right, Your Honor. Anyhow, I'm losing my time quickly here, so let me just go to the heart of that issue. The court erred by finding that NMS' performance only was consideration for the promise to pay a certain rate for 1999. Restatement of contracts, Section 80, as well as Corbinon contract, and every case that's dealt with it has said that a promise, that a single undivided consideration can be bargained for in exchange for one or more promises. In other words, NMS' consideration was going out and selling, and that supported both promises. Your Honor, I'd like to turn briefly to the covenant of good faith and fair dealing claim. What the court said there was that the offering of two prices, in other words NMS being charged more than Quest was charging NMS' own customers, could not have constituted breach of good faith and fair dealing. There is implied in every covenant, in every contract, that covenant, and what you have to look to is the reasonable objective expectations of the parties. What the court said was no matter what you consider the contract, and there's three or four different options for what the contract was, no matter what that was, the contract did not include price terms, therefore it was not reasonable to expect that the NMS would be charged any given rate, or any given price vis-a-vis what Quest was charging its own customers and NMS' customers. That should be a question of fact for the jury as to whether that sort of decision breached the covenant of good faith and fair dealing. There is evidence that it was the policy of Quest to charge equal amounts in the past, that had always been done, and it was the policy of Quest not to call on NMS' customers. That was an industry policy. Suddenly, without warning, and without any agreement at all by NMS, they violated those policies. NMS, it's like the Perkins v. Standard Oil case, where Standard Oil did the same thing to one of its distributors. The court says Standard Oil had too much of an advantage, it knew who its customers were, it shouldn't go out and compete to ruin Perkins' business. The same thing applies here. Thank you. We're going to give you your time to reply. Okay. May it please the Court, Michael Simon for the appellee Quest-Dex, and I will honor the ten-minute request. I think we can do that. Your Honor, what this case really comes down to is an interpretation of a two-page letter dated January 12, 1999, and the relevant question is whether or not that letter creates binding contractual terms obligating Quest-Dex to pay a particular commission rate in the year 2000. The answer to that question can be most clearly seen from the text of that letter itself, and in particular the first paragraph. It's in the excerpt of record, but I have a copy here I've already given to opposing counsel. I think we have it. It's excerpt of record 54, but I also have separate copies if it's convenient for the Court. I'll offer it to you. We have it. We thought that letter's important, too. We all have it sitting here. All right. Then if I may invite the Court's attention to the first paragraph of that letter, and it's on excerpt of record 54. That first paragraph sets the framework and the stage of what this letter is all about, and although the last line is the most important, but I'll set the stage briefly by showing that the letter begins by saying to NMS that we're going to review the 98 financial data that had just finished and to provide information relevant to 1999 compensation. Now, looking at the last line of that opening paragraph, it says that this letter is to confirm your 1999 base commission rate. The letter does not say that it is to confirm your 2000. Well, you couldn't confirm the 2000, then, could you, because you wouldn't know what the gross sales performance was. That's exactly right. But you could set forth the schedule, which is what page 2 appears to do. That's correct. What we did is we stated what we anticipated seeing the following year. Well, what you anticipated seeing perhaps with regard to sales performance, but I don't see any qualifying language with regard to the schedule for 2000 saying this might be our schedule or maybe it won't be our schedule, we haven't decided yet. Sure. Well, I think that's a critical difference, because what I hear you suggesting is that this letter confirms 1999, it doesn't count for anything else, and I see on page 2 a schedule for 2000. Are you telling me that doesn't count for anything? It counts for a statement of future intention, and if it were relied upon by someone's detriment, then it might very well support a theory of promissory estoppel, which, by the way, was expressly disavowed by NMS. It is a statement of future intention, and if relied upon could support a theory of promissory estoppel. But as the court below recognized, the parties had before them the 1994 compensation plan, where on every page it says BECCS reserves the right to modify these terms or change these terms. And so it was well understood by the parties that although we may express a future intention of what we might do next year, we certainly always reserve the right to change those up until the time that we got to that point in time. And so that's how we submit this critical letter should be viewed, Your Honors. As the court recognized, this is a terminable at will relationship. That means we have to ask this. What would have happened if BECCS would have terminated this relationship, say, in mid or even late 1999? You would have had a different case. It's a different story. That's correct. But we still have to – we use that example or understanding to understand how we are to read the 1999, the January 12, 1999 letter. And I submit, Your Honors, the way it's to be read is as a statement of future intention, possibly even a statement that could be relied upon to one's detriment, although I would then submit, Your Honor, had they asserted a promissory estoppel theory, we would then argue that it would not be of reasonable reliance in light of the previous statements that BECCS reserves the right to modify this contract at any time. But in any event – Excuse me. I didn't mean to finish your sentence, please. I didn't mean to interrupt you mid-thought. No, I was just going to say, but in any event, the record evidence shows that there was no substantial change in position that would support promissory estoppel. And as we've argued, they've completely disavowed a promissory estoppel theory. I apologize. Not at all. I'm scratching my head over how the judge could have thrown out the breach of good faith and fair dealing claim. Sure. Especially in light of the allegation that they were soliciting the plaintiff's customers.  The answer to that, Your Honors, because it was nothing more than an allegation with no evidence. This came before the court on summary judgment. And the evidence presented before the court was that there was no actual evidence of any contact or solicitation. That's what the district court correctly found. As a matter of fact, when the appellee before this court cites to the record evidence of the allegedly 12 contacts, what he cites to is the answers that NMS gave to our interrogatories. We gave interrogatories saying you contend there were contacts with whom. And they identified 12 names of businesses. That is the only evidence that was submitted to the district court for the proposition that there were, in fact, actual contacts or actual solicitations. I think everyone below recognized that was not admissible or sufficient. And that's why when the district court was questioning NMS's counsel on this matter, the questioning turned to the topic of the implied covenant. And now I'm referring to the supplemental excerpts of record. At pages 53 to 54 of the supplemental, S.E.R., supplemental excerpts of record, the court asked NMS's counsel the following question. You claim breach of the covenant of good faith happened by contacting NMS's customers, by Dex's salespeople, immediately upon notification, because we argue that there was no such evidence of that. NMS's counsel below responded, the breach of covenant of good faith claim, Your Honor, is broader than that. And then, quote, it doesn't rely on specific contacts. It's just their offering it, offering of the duality of the price system. The court then clarified. So it's just the mere offering of it at the lower price is enough to breach the covenant of good faith. NMS's counsel below, yeah, yes. And that's an S.E.R. supplemental excerpt of record 53 to 54. So the court below recognized, and even reflected in his decision, that there was no admissible evidence of actual contacts or solicitations, and that the issue solely before the court was whether or not the dual pricing system by itself violated the implied covenant of good faith. And there we submit he correctly reached the conclusion it did not. And then finally, Your Honor, the last point I'm going to respond to is the statement that there was evidence that sales made in late 1999 were, in fact, for 2,000 books, or books that were published in 2000. I submit, Your Honor, that there's no record evidence before the court to support that proposition. I believe the closest we come is the affidavit of NMS's president, David Kluge, that appears in the record, an excerpt of record ER 70 to 73, where Mr. Kluge goes on for several pages describing generally a number of various business documents, but never quite comes out and clearly says that there were sales made for books that published in the year 2000. I submit that the absence of evidence on that point, and the absence of a clear statement by Mr. Kluge, shows that there was no evidence to support that point. Is there no further questions, Your Honor? Thank you very much. A couple additional points. I think as far as the termination issue goes, there was no termination in this contract. NMS performed under it, and it should be looked at as a breach, given their performance. On the breach of covenant and good faith claim, if you take a look at the court's opinion, the court did not dismiss that claim because of a lack of evidence of contacting customers. When the court asked counsel me about that claim, he just said it was broader than that, and you could rely for that claim on merely the difference in price. That makes perfect sense. If DEX is out there offering a product to us, to NMS, that is more expensive. They're charging NMS more than they're charging NMS's customers or NMS's potential customers. Hard to compete, impossible to compete, impossible to get new customers, and the court dealt with it in those terms and said that that did not constitute breach of covenant, good faith, and fair dealing. Was there evidence that Quest contacted your guys' customers? Yes, there was. I believe the evidence in the record is twofold. One of the instances is as cited by counsel. There was an affidavit by David Kluge, which is in the record, which sets forth the 12. I believe there's 12 instances, and I think if you go through those, some of those are admissible. Some of them, admittedly, would be hearsay. There's also, though, the testimony of Mr. Kluge stating what Mr. Quinn, Quest National Sales Manager, told him, and what he told him in July of 1999 was that the Quest local salespeople were going to start calling on NMS's customers. That's in the record. That's admissible. It's an admission of a party opponent. That evidence is there, and that evidence, there's enough there that it should be given to a jury. But I still contend, if you take those two courses of conduct, either one of them supports a claim for breach of covenant, good faith, and fair dealing, because NMS never, no party ever could have had the expectation that the party with whom it had been dealing with for years would do something like that and totally eradicate its ability to compete. Either one of them, the pricing or the contacting. So your allegation is that just having a dual pricing system, what amounts to a dual pricing system, is itself a violation? Yeah, that is enough. But you go on to say that you had more here than that theory. That theory is what the district court passed on. Yeah, that's all they passed. And they passed on that theory because of the discussion that you just heard quoted. But the court didn't find an absence of evidence on the other theory. The court just concentrated on that one. Just the same as I'm doing to you today, I'm saying that I said then that the pricing was enough. And it is enough, but you add them together, and it's more egregious. I don't think anybody, if you go back to the Perkins v. Standards Boyle case, I think they're similar, and I think a jury should get to view that issue. Well, Perkins involved solicitation. I mean, that's solicitation of the other party's customers. Yes, it did. That's a key point of that case. Yeah. It wasn't just dual pricing. It was overt solicitation. And, in fact, it wasn't dual pricing. It was just the same. Here we have some more, I think. Or different. Thank you. Thank you. Case discharges will be submitted. The final case of the morning is Klamath Siskiyou Wildland Center. This is Bureau of Land Management. All right. This is the final case, and this will be the final speech of that time. So if you could both try to hold this to 10.
judges: Reinhardt, Silverman, Clifton